May I please the Court, my name is Stella Tsai, I represent the Appellant Gregory Call in this matter, and we respectfully request three minutes of rebuttal time. We think it's important to note that the last time we were before this Court, the trial court had already found that Call had proven key elements of this non-typical loss causation case. First, that the PEI parties had made a material misrepresentation and omissions to Call and concealed the existence of a Business Integrity Commission investigation into PEI's organized crime. And this happened when he was selling the companies to them, and Greg was selling Call to them, that the PEI parties acted with scienter, that is, that they acted with a wrongful state of mind, and that this particular misrepresentation was made in connection with the sale of the securities, and that Call would not have entered into this transaction had he known about the existence of these proceedings. So you were left with the issue, essentially, of damages. That is correct. Loss causation and damages. Mr. Sheriff was finally allowed to present expert testimony. He was allowed to present expert testimony. By my review of the record, he had a dreadful performance before the district judge. You wouldn't agree with that. I could see that the district judge was not very happy about his testimony. He made findings, and perhaps the most important one, he just found the witness not credible. So in that respect, how do you get over that deferential standard that we have to give the district court's findings? Your Honor, I would like to characterize his performance a little differently. I think that his testimony was consistent with the report that he submitted before, and I would like to clarify that this Court had evaluated and considered that the standards for non-typical loss causation and damages. When we remanded, it was only for admission of the report. There hadn't, at that point, been any testimony. So we now have these credibility findings, and we have this very deferential standard of review. If we accept that his testimony is not credible, and we set that aside, can you still prove loss causation? What else in the record supports your loss causation theory? We believe that the record does support loss causation, whether you consider the testimony or not, because of the inexorable chain of events that led from the nondisclosure of the proceedings to the ultimate outcome of that proceeding, which was the ban. But I would like to address your question about the reliability of your deferential standard, and we understand that that's the case. However, if you look at the testimony closely and the questions that were posed to him, they all related to tests of loss causation that were usually reserved for typical cases, for on-the-market cases. He challenged questions, and if you look at this, they asked him to disaggregate the other causes at the same time as the other factors, which is not something that's required in a non-typical case. He also required Sheriff to quantify the loss that was attributable to the drop in stock price, which is also something that is required in a on-the-market case, but not in a non-typical loss causation case. All we were asked to do, in which we followed the letter, we believe, of the opinion, was to show that there was some negative impact between the misrepresentation, which was the concealment of the big proceedings, and the ultimate outcome. And, you know, the damages, or the loss of the business. You're talking about the concealment of the investigation. That's correct. That's correct. And the ultimate outcome of that was the ban, actually the loss of license. And I'd like to address one point. But, you know, in fact, would you comment on the fact that several companies, corporations, have investigations. Sure. They don't necessarily suffer a loss in valuation because they're being investigated. That's a comment that the trial judge made. And I tend to agree that that's true. But your expert didn't differentiate. I believe that our expert did talk about the outcome of that proceeding. The letter had just come in from recommendations. And the recommendation had recommended the loss of the, or the denial of the permit. Which they tried to evade that particular proceeding by turning in their permit. But it's, you know, we use these words interchangeably, permit with the registration. They tried to turn it in. But the BIC, which, you know, investigates organized crime, said, no, you can't turn it in. You have to, you know, we're not allowing you to turn it in. We're going to continue with this proceeding and investigate what's going on. And the outcome of that particular proceeding is different. It's different than any other. It's an organized crime proceeding, or investigation. It's almost like wearing a scalloped letter. It has collateral consequences for this particular industry. This industry had been rife with organized crime. And they created these special procedures, you know, Act 42 in New York, to regulate, to make sure that the corruption would not continue. Ms. Pike, could you go back to the question of what else in the record if we're not, if we put aside or discount the value of the expert's testimony? What else supports loss causation? Because aren't we talking here about an intervening period of years? Those are years when there was a major change in the economy for many businesses that were in the sector, and where this business continued as a going concern through that period. It did continue as a going concern, but the die had already been cast. I mean, the proceedings, it was like a domino effect. You start with the proceeding, with investigation, and if you look at the BIC report, which outlines in detail the interactions between PEI and the BIC, and BIC, it was this constant, there was a constant, it was one proceeding from beginning to finish. And it's an existential one. I mean, you know, ultimately, if you look at, if I could point you to their own words, actually, from a pleading that they filed. Give me a second. This is at page JA00573, where BIC said itself about the impact of this proceeding. The effect of the BIC order was, and I quote, PEI and its owners cannot do business with any of the city's waste haulers, produce wholesalers, and fish wholesalers, all of which are regulated by BIC, and cannot even deal with the principles of those businesses. A term which, by statute, reaches the parents and grandchildren of a company's stockholders, such that the company and its owners are exiled from New York City and hobbled outside the city's limits. And without the ability to do business, there's no revenue, and this is why our, the expert, Mr. Scherff, was able to reach, and also, you can, it's almost logical. Let me ask you, there's a lot of facts in this case, and the district court's factual findings were extensive. They were. Particularly if you take the two memorandum opinions together. But are you arguing that the court applied the wrong legal standard? I am. And what do you say the court did wrong legally? The court, when evaluating the evidence, wanted our expert and Mr. Call to disaggregate the other causes, and did not require, that's not a requirement under the precedent that was set by this court in the prior opinion. And also, asked him to identify the quantum, behind being the expert, the quantum of difference in the stock price. It's a, that's a market-based theory. It's not a, it's not a non-typical loss causation. We have one-to-one fraud. I mean, there's no question that he misrepresented the fact, or misconceived the fact of these proceedings, which were ongoing at the time. You have the burden to prove the elements, and for, when we're talking about loss causation, doesn't that include addressing those things that are potentially obvious superseding types of causes? What authority do you have that the burden on that should shift to the defense? There is a case that was cited by the trial court, Boreas, which we've, Judge Fischer was a member of that panel, in which the court actually looked, and there was a material misrepresentation case, but there's an analogy, and the trial court actually cited to this, where they cite the restatement test, which talks about intervening causes, but it's very clear that it says that, as you did in the, as the Third Circuit did in the original opinion, although Section 433 of the restatement instructs courts to consider the effect of other factors on a plaintiff's alleged injury, it is well established that a substantial factor need not be the only factor in bringing about the relevant harm. Mr. Scherff, he apparently made a lot of mistakes. In the first instance, he misnamed the comparables that he was using, used the wrong comparables, came back and had to correct it on the record. In addition to that, he left out substantial damages that Pure Earth had suffered because of litigation expenses, exceeding $12 million, completely left it out of his bottom line analysis. Those are things that seem to me that drove the district court's decision. You want to comment on those? Yes, I would like to comment on those. Those particular, and some of the larger litigation was related to pension liability, is one of those big pieces of litigation, and that occurred because they turned in their license, or tried to turn in their license and discontinued business. And Judge Davis, or the trial court, actually said that the reason why they turned in their license in a prior decision, I'm sorry, the reason? The reason they turned in their license was because of the big proceeding. So it all relates to that. I mean, when you have a superseding cause, and if you look at the Boreas case again, it is the defendant's burden to prove the impact of the intervening cause. And when you're looking at intervening, superseding causes, they need to be independent of the actor, and they need to be not foreseeable. Those things that they, major pieces of litigation, and there are many factors that the judge may have identified, but relate, and it's addressed in our papers. One additional question. Is it of any consequence that when the information concerning the investigation was finally made public, it was in the year 2010, and by then the stock price was at $0.17 a share, whereas when the deal was made it was at $5 a share? There is, it's important to note that this was a concealment. The public didn't know what the consequences were. They had to change their model of making, doing business. And also, one thing that's omitted is the fact that in 2010, all the factors are going toward recovery. And there is a piece of evidence where a contract was terminated in 2010. Let me finish up your sentence. Okay. In 2010, because of the big proceedings and the outcome and the ban. All right. Thank you, Ms. Howard. Get you back on rebuttal. Mr. Marks. Let me just, if I could organize my paper here for a second. Judge Fuentes, good morning. Judge Fischer, good morning. Judge Krause, good morning. Let me just go straight to Judge Fischer's question on the issue of the law that would govern this. And I'd like to direct the Court's attention to two cases that were cited in the opinion in our briefs. The one is McCabe, which Judge Fuentes sat on the unanimous panel. And the other is Berkeley, in which Judge Fischer wrote the decision. These are both non-typical loss cases. They have to show two things. One is they have to show the true value of the shares at the time of purchase. Second, Your Honor, under McCabe and following Dura, the Supreme Court decision, they then have to show that the loss that they suffered was proximately related to the omission or the misrepresentation. It is not sufficient. Dura rejected. McCabe rejected. Berkeley rejected. And, Judge Fischer, your Berkeley decision was based on the Samarenko case, which was cited in the Supreme Court Dura case. Rejected that you could merely show that, by an expert or some other means, that the true value of the shares were less than what you received. You have to show two things, the true value was less, and that ultimately the loss was caused by that specific omission and representation. Even setting aside the expert's testimony here, why isn't there enough on the record to find that it was a substantial factor in causing the loss, where, I mean, Dura was 40% of Pure Earth's most profitable division, and the district court, when it rejects the testimony of Brent Kopenhauer, finds unworthy of belief his statement that the loss of Dura's big registration had no effect on Pure Earth's business. Isn't the district court acknowledging in that statement that it had some impact? In other words, that there is proximate cause, it takes us to a different issue, perhaps, of damages, but why hasn't that loss causation been established? The reason, and the district court was fair and equal in his criticisms of the witnesses on both sides. The answer is this. The district court didn't believe Mr. Kopenhauer that it had no impact. But it was up to the plaintiff to determine what impact it had. Why isn't that a damages question? Because Judah only had income of $30,000 and $20,000. Their expert completely ignored it. So, yeah, it had some impact. If they gave back the license, which they did, they would maybe make $30,000 or $20,000 less a year. And that's what the record shows. But in the scheme of Pure Earth, which was a company that had millions and millions of dollars of revenue, that's nothing. And what they did is they changed their business model. They went from using the trucks at Judah to using the brokerage model. And their expert, and, again, this is their Burton or Mr. Call, none of them were able to offer any evidence whatsoever that that had any impact on their business. And to the contrary, the district court's explicit finding, it's number 14 in his opinion, he found that the loss that was caused was caused by the other factors. It was caused by the recession. It was caused by the loss of business in New York City. It was caused by the change in the pricing of the business because of economic pressures. It was caused because they couldn't get financing, and they had to get financing where the interest rates were 20%. It was caused because the financing required them to use a factor, and their customers became aware that they had a factor which told the market that they had some economic uncertainty. It was caused by the litigation that this district court expressly found. There were cases involving a former company where Mr. Hall sent their work, which sued them for interference with contractual relations. The pension liability had nothing to do with the decision to give back the permit. Pension liability was based on preexisting problems. Could you comment on, I believe it's Mr. Call's contention, that had there been a full disclosure of the investigation of Pure Earth at the time the agreement was signed, I never would have entered into the agreement, and I wouldn't have suffered any losses. Well, no doubt Judge Davis accepted that, but that's transaction causation. That's not loss causation, and both Judge Fischer and Judge Fuentes and the opinions that you issued in those two cases, you've made clear that you cannot flate transaction causation with loss causation. So, yeah, we accept. If they had told Mr. Call about this investigation, he would have walked away from the deal, but that's not loss causation. He still has to show, which he didn't, that the true value of the shares were less than what he had, because he had nobody who knew anything about BIC. There was nobody who could say, you know what, if the market had known about this in 2007, that we would have discounted the value of the company, because we all know from investigations that you can't necessarily predict what's going to happen. We have investigations here in Pennsylvania, you know, of the Attorney General. We see investigations, you know, in Missouri and New York. Nobody knows what's going to happen, usually, until it's completed. And here, as Judge Krause, I think, noted, it was a gap of two and a half years where they heard nothing. So who would know what was going to happen unless you had an expert with a crystal ball who was able to predict what happens with BIC investigations. So that's the point. One, they never offered – there was no evidence that Judge Davis found to be credible on the first stage that the true value of the company was less. But we're dealing here with a particular type of investigation, and one where pages eight to nine of his opinion, Judge Davis recognizes that the significance of a BIC investigation into organized crime in this particular industry, given its history in New York, and says the information concerning the BIC investigation was clearly important to the ability of PEI to operate in the New York City market. Given that, and given that it's almost a common-sense proposition with the background that the district court lays out, that disclosure of that investigation would have had some impact at the time on the value of the shares, why shouldn't we look at this as a damages question rather than a loss question? Because there has to be some correlation as to the impact that that would have. Under the securities law, I'll get the decision, but you typically have to have an expert who's going to opine on it. Under the securities law, it's just not a common-sense conclusion. So, yeah, if there's an investigation, both Judge Krause and I would say, yeah, that should have some impact, but how much impact? And you need to have an expert, a qualified expert do that. And don't forget, the impact wasn't the loss of the license. They gave the license up and the record shows that it had negligible impact on the company. The issue was, would there be a ban of Pure Earth in New York? If we're taking a proximate cause model of something that is reasonably foreseeable, with this type of investigation, the history here of the individuals involved who themselves had been suspended and their business suspended in the industry previously, how can we say that that's not a reasonably foreseeable consequence of this investigation? I know I'm not supposed to be the one asking the question, so I'm doing this rhetorically. Judge Krause, could you say in March of 2007 that it was predictable that the company would be banned from doing business in New York in June of 2010 and that there would be two and a half years of radio silence where BIC allowed the company to operate? Could anybody have predicted that there would have been a ban in March of 2007? That's the question. You're right that it would be better to answer. And my answer is, unless you have an expert who knows something about BIC, the answer is no. There's no evidence that somebody could have reasonably predicted that would have been the result. And listen, if a month later that's what would have happened, we'd be here in a very different circumstance. As Mr. Call perhaps would have been able to establish that the company failed because of that ban. But unfortunately what happened was, and as Judge Davis found in, again, paragraph 14, the company failed for other reasons. And under the two cases, McCabe and Berkeley, they missed the connection. They could have brought a case. They could have said, I forget which of the judges, in June of 2010 when the decision was made public, the value of the shares were $0.17. They could have made a case based on that value and whatever the loss was over the next 60 days. They chose not to do that. They chose to go for the $7 million instead of, I don't know, $100,000 or whatever it would have been. That was a litigation decision that they would have made. You did not introduce any expert testimony on the existence of intervening causes, did you? I didn't have to, Your Honor, because I used their expert. I understand. But if there was no testimony, no expert testimony on intervening causes, is it valid for you then to be able to contend that the BIC investigation wasn't a substantial factor in causing the stock decline? Well, first of all, it's not my burden. Under McCabe and under Berkeley, it's their burden to show the proximate cause. And second, I don't need expert testimony to do that. When the record is based on the testimony of the fact witnesses, which was accepted by Judge Davis, is that the company failed for economic reasons, the recession, the drop in business in New York City, the change in pricing, and et cetera. Again, it's a factual finding. It's subject to an abuse of discretion. And it was replete with support in the record that the company failed by May, June of 2010 for these economic reasons. And interestingly, their expert, their own expert, when he did his report, in his little graph, he said, you know, there were four reasons why the stock went down. There were four misrepresentations. There was the Rego Park. There was the Proforma. There was not getting the World Trade Center contract. But when I examined him, there was another meltdown because I said, well, the judge has excluded these three factors because of the integrated sales contract. But tell me, from your report, what were the reasons that the stock declined from, you know, the $5 to 17 cents? And he said, I asked him, if your report is correct, sir, the decline in the price of the share is caused by the misrepresentations from $5 or so in February of 2007, the 17 cents as of May 10, 2010 was caused by the other three misrepresentations, right? Answer, that's right. So their own expert said that the decline was caused for reasons unrelated to the disclosure of the BIC investigation. So whether you accept Judge Davis's findings that they were caused by economic reasons or their expert's admission that the loss was caused by these other reasons, there's nothing that supports them linking the omission to the damages. Some of those findings, those economic findings, relate to things that under Kahl's theory of the case are sort of a domino effect, resulting from Judah's loss of the license, for example, the $12 million judgment, the need for a factor because of the loss of the line of credit. Can you address those and why this record doesn't support that those causes that were acknowledged by the district court as contributing here weren't themselves a result of this misrepresentation? Well, that's Kahl's brief. It's Kahl's brief. He's quoting mainly Mr. Levan, the felon who gave his testimony, Judge Davis also rejected. And so that's not what happened. That's not what the record reflects. The record reflects that they gave up the license in, I don't know, October of 2007, and they slightly changed their business model. And the reason that the company ultimately failed was because of the recession. And their expert, as Judge Davis noted, gave that no consideration whatsoever. And this wasn't, you know, whether it's round one of the companies that Kahl thought, I mean that Scharf thought his report was based on, or the real companies that he based his report on, you know, this wasn't a Fortune 100 company. This wasn't, you know, a widely integrated, you know, waste company. It failed because of a recession that took place in its key market in New York. And that's what Judge Davis found. And unless you were to find that he abused his discretion in accepting somewhat undisputed facts below, then Mr. Kahl failed to meet his burden that the loss was covered by this omission or this misrepresentation. I take it you'd argue in the alternative that damages here are too speculative and uncertain, even if loss causation had been shown? That's right. The only damages that he could show as a result of the big investigation are damages that would have taken place after its disclosure when the stock was valued at 17 cents. And he chose not, he could have, but he chose not to pursue that. So the fact of the matter is that the company failed for reasons unrelated to the big investigation, and therefore, you know, under, there's no way to say what those damages would have been. In fact, the way, there is no damages, again, because of the unfortunate occurrences that took place in the economy. Mr. Marks, thank you very much. Judge Fuentes, thank you. Ms. Tsai? Hi, thank you. Just have a few points to make in response. First is that we need to look at what the Third Circuit did in the prior opinion with respect to how you calculate damages. And you're supposed to look at what the value of what you receive versus what you're supposed to receive. And that was all laid out very clearly in the contract. It was valued at $5 a share, and there is a specific amount, and that's all set forth pretty clearly in our papers. But one of the things I think that was alluded to earlier we need to emphasize, and that is that the trial court itself had already found that what VEI brought to the transaction was worthless. Davis credited that testimony, and that pertains to the damages announced. The value was worthless at the time of the stock? At the time, the value of the transaction was worthless to call and to any investor at the time of the transaction. The stock purchase agreement? The stock purchase agreement. Worthless because? Excuse me? Worthless because? Because nobody who would have known about the truth of the matter, which is the existence of this proceeding, which had collateral consequences that were substantial, existential in fact, for any investor who would proceed. Mr. Marks says it's a transaction loss, not actual loss. The loss causation analysis with respect to loss causation is different in that what the worthlessness has to do more with at the point of the time of the transaction has to do with the damages analysis, not loss. The loss causation is something where you look to see if there's a connection at all, any kind of connection. The case in Berkeley, which was alluded to earlier too, was a situation where the plaintiff admitted that there was no connection between the loss that was being alleged and the specific transaction or the specific allegation that was, as I recall, it was a failure to register the stock in Berkeley. Any connection is not enough under the standard that we're applying. We need to see it as a substantial factor. And one thing that I would add with respect to that is that you have a situation where after the BIC proceeding was disclosed to the public and after it never had a chance to recover, other businesses might be able to survive. There was nothing left because of this ban. Because of? The ban on the debarment. It was the end. That was not until, that was in the year 2010. Correct. But it also was an outcome of a proceeding. It was like a dominant effect. It just was, there was no intervening cause. Just, I'm sorry, one last question. Yes. Could you address on the damages point, Mr. Marks has argued that damages here are too uncertain and speculative, even if we were to reach that. Can you address that argument and also who has the burden of proof if we reach a damages stage? If we reach the damages stage, I hope you may, that the burden of proof is on the plaintiff, the person, the party trying to establish damages in this case. However, with respect to the other causes that might have somehow affected the price or the damages number itself, that's the burden on the defendant. That is something that we also briefed in our papers, that it is the burden on, if you want to disaggregate and try to find other causes, try to somehow reduce the amount of damages, you need an expert to do that. The defendant did not put one on. Ms. Sy, thank you very much. Mr. Marks as well, thank you both for your arguments. With the case under advisement and for the next...